UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ANTOINE T. SIMMONS,

                    Plaintiff,

      v.

HEIDI MASON, *et al.*,

                  Defendants.

No. 17-CV-8886 (KMK)

<u>OPINION & ORDER</u>

<u>Appearances:</u>

Antoine T. Simmons
Cape Vincent, NY
*Pro Se Plaintiff*

Sean Timothy Carey, Esq.
Westchester County Attorney's Office
White Plains, NY
*Counsel for County Defendants*

Jeremy J. Hourihan, Esq.
Bryan J. Maggs Law Office, PLLC
Elmira, NY
*Counsel for Warden Diaz*

Paul Andrew Sanders, Esq.
Jonathan H. Bard, Esq.
Barclay Damon LLP
Rochester, NY
*Counsel for Warden Diaz*

Daniel Gerard May, Esq.
Darshan Ishvar Patel, Esq.
Doreen Dufficy, Esq.
Heidell, Pittoni, Murphy & Bach, LLP
New York & White Plains, NY
*Counsel for Dr. Teperman*

KENNETH M. KARAS, United States District Judge:

Antoine T. Simmons ("Plaintiff") brings this pro se Action, pursuant to 42 U.S.C. § 1983, against Westchester County Assistant District Attorney ("ADA") Nadine C. Nagler ("Nagler"), Warden Diaz ("Diaz") (together, "County Defendants"), Dr. Sheldon Teperman ("Teperman"), P.O. Api ("Api"), Officer Lebzetter ("Lebzetter"), Officer McManus ("McManus"), P.O. Spaun ("Spaun"), Dr. Audrey Pendleton ("Pendleton"), Dr. Frank L. Weber ("Weber"), and Nurse Elliot K. Lee ("Lee") (collectively, "Defendants"), asserting claims for false arrest and illegal search and seizure in violation of the Fourth Amendment, and for deliberate indifference to his medical needs in violation of the Eighth Amendment. (Second Am. Compl. ("SAC") (Dkt. No. 91).)

Before the Court is County Defendants' Motion To Dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), and Teperman's Motion To Dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (*See* County Defs.' Not. of Mot. (Dkt. No. 52); Teperman Not. of Mot. (Dkt. No. 64).) For the following reasons, the Motions are granted.

## I. Background

### A. Factual Background

The following facts are drawn from the Second Amended Complaint, Plaintiff's Memorandum of Law, (Pl.'s Mem. of Law in Opp'n to Mot. ("Pl.'s Mem.") (Dkt. No. 94)), and Plaintiff's supplemental letter docketed April 5, 2019, (Pl.'s Suppl. Letter in Opp'n to Mot. ("Pl.'s Letter") (Dkt. No. 90)), and are taken as true for the purpose of resolving the instant Motion.[1]

---

[1] Only Defendants Nagler, Diaz, and Teperman have moved to dismiss Plaintiff's claims. Therefore, the Court will only recount facts relevant to Plaintiff's claims against those Defendants.

On October 19, 2014, Plaintiff was admitted to Jacobi Medical Center ("JMC") in Bronx, New York after a car accident in which a passenger died. (SAC 3, 7; Pl.'s Mem. 10.)[2] At the time, Plaintiff had two active warrants for his arrest, one for domestic violence charges and one for "failure to report to parole." (SAC 13.) Plaintiff suffered a broken mandible in the crash, requiring reconstructive surgery. (*Id.* at 3, 7.) Plaintiff was in a coma when he arrived at the hospital and was handcuffed to the hospital bed; he alleges that he remained in a coma until October 22, 2014. (*Id.* at 13.)[3] While unconscious, his blood and urine samples were taken. (*Id.* at 6, 18 (alleging that Defendant Lee "took two tubes of blood from [P]laintiff upon admission to [JMC] for testing for hospital purposes"); *see also* Pl.'s Mem. 27 ("Toxicology Screening Test" dated October 19, 2014 ordering urine testing).) According to Plaintiff, Defendant Nagler "sent [JMC] a letter to hold [Plaintiff's] blood and urine until they obtain a search warrant." (SAC 17; *see also id.* at 6 (alleging that Nagler ordered JMC to "hold [Plaintiff's blood and urine samples] until she obtain[ed] a search warrant").) Plaintiff alleges that a judge "signed Detective [Scott Griffith's] search warrant 16 days later." (Pl.'s Mem. 15.) Detective Griffith ("Griffith") then obtained Plaintiff's blood and urine samples pursuant to a "search warrant [that] clear[ly] state[d] Antoine Simmons." (SAC 18; *see also* Pl.'s Mem. 11 ("Request for Toxicology Services") (indicating that Griffith collected samples from JMC "by assigned Detective with Search Warrant" on November 5, 2014 after "DA's office sent preservation letter for blood – urine").)

---

[2] The Second Amended Complaint and Plaintiff's other submissions lack consistent pagination and include several pages of medical records interspersed throughout. For ease of reference, the Court cites to the ECF-generated page numbers at the upper right corner of each page when citing Plaintiff's submissions.

[3] Plaintiff's allegation that he remained in a coma for three days is contradicted by the medical records he submitted which indicate that he was responsive to hospital staff by October 20, 2014. (*See* Pl.'s Mem. 71 (noting on October 20, 2014 that Plaintiff was "following commands appropriately" and was "off sedation").)

During his stay at JMC, Plaintiff alleges that the police officers guarding him were "trying to kill [him] by repeatedly tight[en]ing the handcuffs while [he] was [a]sleep." (SAC 13.) These officers "would tighten the handcuffs" while Plaintiff slept, "causing the heart monitor to go off very loud," and "would loosen them only after [P]laintiff['s] complaints" when he awoke. (*Id.* at 15.) Plaintiff alleges that on October 27, 2014, he "signed out of the hospital in fear of his life from the Yonkers police officer[s] . . . after numerous attempts of notifying the Doctors that the Yonkers police officer[s] . . . were trying to kill him." (*Id.* at 7.) In November 2014, Plaintiff "became aware of his face being infected . . . when he [saw] Dr. Frank L. Weber[,] who informed [P]laintiff that his face was infected and needed a second surgery." (Pl.'s Mem. 33.) He asserts that Teperman "had a duty to . . . inform [Plaintiff] of his severe medical condition," and that if Teperman "would [have] inform[ed] [Plaintiff] of the infection he was suffering[,] [Plaintiff] would [have] never signed out [of] the hospital." (SAC 8.)

Plaintiff asserts claims sounding in false arrest, unlawful search and seizure, and deliberate indifference to his medical needs. He seeks $2,400,000 in damages for his pain and suffering. (SAC 20.)

B. Procedural Background

Plaintiff initiated this Action on October 30, 2017 against Administrative Law Judge ("ALJ") Michael Marasa ("Marasa"), ALJ Betty Kyle ("Kyle"), Westchester County ADA Heide Mason ("Mason"), Nagler, David Ortiz ("Ortiz"), and Thorlen Gorard ("Gorard"). (Compl. (Dkt. No. 1).) Plaintiff was granted IFP status on December 19, 2017. (Dkt. No. 10.)

On January 12, 2018, Chief Judge McMahon ordered Plaintiff to amend his Complaint, as it failed to state a claim as pled against any Defendant. (Order to Amend (Dkt. No. 11).) Chief Judge McMahon dismissed claims against Marasa and Kyle on grounds of judicial

immunity, and dismissed claims against Ortiz and Gorard for failure to plead state action. (*Id.* at 3–6.) Chief Judge McMahon dismissed Plaintiff's remaining constitutional claims for failure to state a claim or allege the personal involvement of any Defendant. (*Id.* at 6–8.)

Plaintiff filed the First Amended Complaint on April 24, 2018, this time naming as Defendants Api, Diaz, Lebzetter, Lee, McManus, Nagler, Spaun, and Teperman, as well two John Doe Doctors. (First Am. Compl. ("FAC") (Dkt. No. 14).) The John Doe Doctors were subsequently identified as Weber and Pendleton. (Dkt. No. 35.) Api, Lebzetter, McManus, and Spaun filed an Answer on September 27, 2018. (Dkt. No. 51.)[4]

On October 1, 2018, County Defendants filed a Motion To Dismiss. (County Defs.' Not. of Mot.; County Defs.' Mem. of Law in Supp. of Mot. ("County Defs.' Mem.") (Dkt. No. 54); County Defs.' Decl. in Supp. of Mot. ("County Defs.' Decl.") (Dkt. No. 53).) On November 15, 2018, Teperman filed a Motion To Dismiss. (Teperman Not. of Mot.; Teperman Mem. of Law in Supp. of Mot. ("Teperman Mem.") (Dkt. No. 65); Teperman Decl. in Supp. of Mot. ("Teperman Decl.") (Dkt. No. 66).) After granting Plaintiff several extensions due to his transfer to another facility to undergo surgery, (Dkt. Nos. 71, 77, 83, 89), Plaintiff filed the Second Amended Complaint on April 4, 2019, naming Weber and Pendleton in lieu of the "John Doe Doctors," (SAC). He also filed a letter supplementing his allegations on April 5, 2019, (Pl.'s Letter), and filed his opposition to both Motions on April 12, 2019, (Pl.'s Mem.). Teperman filed a reply on May 8, 2019, (Teperman Reply in Further Supp. of Mot. ("Teperman Reply") (Dkt. No. 105); Teperman Reply Decl. in Further Supp. of Mot. ("Teperman Reply Decl.") (Dkt. No. 104)), and County Defendants filed a supplemental brief addressing any changes Plaintiff

---

[4] Pendleton and Lee have not yet been served in this Action; on July 11, 2019, the Court directed Teperman to ascertain the addresses where they may be served and furnish that information to Plaintiff. (Order (Dkt. No. 122).)

made in the late-filed Second Amended Complaint that impact his claims against them, (County

Defs.' Suppl. Mem. of Law in Supp. of Mot. ("County Defs.' Suppl. Mem.") (Dkt. No. 111)).

## II.  Discussion

### A.  Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual

allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his

entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the

elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)

(alteration and quotation marks omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure

"demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft

v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted).  "Nor does a complaint suffice if it

tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and quotation

marks omitted).  Instead, a complaint's "[f]actual allegations must be enough to raise a right to

relief above the speculative level." *Twombly*, 550 U.S. at 555.  Although "once a claim has been

stated adequately, it may be supported by showing any set of facts consistent with the allegations

in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to

relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claims

across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also

Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will

. . . be a context-specific task that requires the reviewing court to draw on its judicial experience

and common sense.  But where the well-pleaded facts do not permit the court to infer more than

the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that

the pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed.

R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

In considering Defendants' Motion To Dismiss, the Court is required to "accept as true all of the factual allegations contained in the [C]omplaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (same). And, the Court must "draw[] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Where, as here, a plaintiff proceeds pro se, the Court must "construe[] [his complaint] liberally and interpret[] [it] to raise the strongest arguments that [it] suggest[s]." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (per curiam) (quotation marks omitted). However, "the liberal treatment afforded to pro se litigants does not exempt a pro se party from compliance with relevant rules of procedure and substantive law." *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (quotation marks omitted).

Generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks omitted). However, when the complaint is drafted by a pro se plaintiff, the Court may consider "materials outside the complaint to the extent that they are consistent with the allegations in the complaint," *Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL 3972514, at *4 n.3 (S.D.N.Y. Aug. 2, 2013) (quotation marks omitted), including, "documents that a pro se litigant attaches to his opposition papers," *Agu v. Rhea*, No. 09-CV-4732, 2010 WL 5186839, at

*4 n.6 (E.D.N.Y. Dec. 15, 2010) (italics omitted), and "documents either in [the] plaintiff['s]

possession or of which [the] plaintiff[] had knowledge and relied on in bringing suit," *Chambers

v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quotation marks omitted).

    B.  Analysis

        1.  Claims Against Nagler

            a.  Fourth Amendment

Plaintiff brings claims against Nagler for violation of his Fourth Amendment right to be

free from unlawful search and seizure.  (SAC 6.)  Plaintiff argues that Nagler violated his rights

by ordering JMC to turn over his blood and urine samples without his consent.  (*Id.* at 6, 19.)

Plaintiff does not appear to allege that Nagler directed medical personnel to draw blood or

collect urine from Plaintiff; rather, he alleges that she asked JMC personnel to preserve the

samples until a search warrant could be obtained.  (*See id.* at 17 (alleging that Plaintiff's blood

and urine samples were "taken by Jacobi Medical staff for hospital purposes").)  County

Defendants argue that this claim is barred by the statute of limitations and also fails to state a

claim.  (County Defs.' Mem. 9–15.)

Both "blood and urine tests constitute searches under the Fourth Amendment."  *Anthony

v. City of New York*, 339 F.3d 129, 142 (2d Cir. 2003) (citing *Schmerber v. California*, 384 U.S.

757, 767–68 (1966), and *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 617 (1989)).

However, law enforcement may constitutionally obtain DNA samples pursuant to a valid

warrant.  *See Mitchell v. Wisconsin*, 139 S. Ct 2525, 2544 (2019) ("If officers can reasonably

obtain a warrant before a blood sample can be drawn without significantly undermining the

efficacy of the search, . . . the Fourth Amendment mandates that they do so." (citation and

quotation marks omitted)); *Birchfield v. North Dakota*, 136 S. Ct. 2160, 2172 (2016)

("[C]riminal law ordinarily may not compel a motorist to submit to the taking of a blood sample or to a breath test unless a warrant authorizing such testing is issued by a magistrate."); *cf. United States v. Lester*, No. 95-CR-216, 1995 WL 656960, at *8 (S.D.N.Y. Nov. 8, 1995) (denying motion to suppress evidence obtained pursuant to the execution of a search warrant for the taking of blood samples for DNA analysis).

Plaintiff's own submissions indicate that his blood and urine samples were collected pursuant to a warrant. Plaintiff's Memorandum includes a "Request for Toxicology Services" dated November 5, 2014 from the Department of Laboratories and Research: Division of Forensic Toxicology of Westchester County, indicating that the blood and urine samples collected from JMC "were picked up by assigned Detective with Search Warrant," and that prior to that, the District Attorney's office "sent [a] preservation letter for blood – urine." (Pl.'s Mem. 11.) This is consistent with Plaintiff's own allegation that Nagler "sent Jacobi Medical a letter to hold [Plaintiff's] blood and urine until they obtain a search warrant," (SAC 17; *see also id.* at 6 (alleging that Nagler ordered JMC to "hold [Plaintiff's blood and urine samples] until she obtain[ed] a search warrant"); 18 (alleging that Griffith obtained Plaintiff's blood and urine samples pursuant to a "search warrant [that] clear[ly] states Antoine Simmons")), as well as Plaintiff's allegation that a judge "signed Detective [Griffith]'s search warrant 16 days later," (Pl.'s Mem. 15), which would fall on the precise date of the "Request for Toxicology Services" form Plaintiff attached to his Memorandum. Although Plaintiff argues that "on [October 19, 2014,] Nagler had no information supporting probable cause to take Plaintiff's blood and urine," (SAC 4), it is clear from Plaintiff's submission that the DNA samples were not retrieved until November 5, 2014, pursuant to a search warrant, (Pl.'s Mem. 11). There is nothing improper about Nagler obtaining Plaintiff's DNA samples pursuant to a valid search warrant. *See*

*Birchfield*, 136 S. Ct. at 2172 (noting that authorities may compel the taking of a blood sample if a warrant is issued); *see also People v. Casadei*, 489 N.E.2d 244, 245 (N.Y. 1985) ("It is clear that a search warrant may validly be issued to obtain a blood sample, in the event of a violation of the Penal Law . . . ." (citation omitted)).  Plaintiff has not identified any improprieties with respect to how the warrant was obtained, other than his conclusory assertion that there was no probable cause.  *See Barrows v. Coleman*, 352 F. Supp. 2d 276, 282 (D. Conn. 2005) (noting that a search "pursuant to a warrant issued by a judicial officer" is entitled to "a presumption that probable cause existed for the search" absent a showing that the warrant contained material inaccuracies or omissions (citing *United States v. Awadallah*, 349 F.3d 42, 64 (2d Cir. 2003))); *cf. Lester*, 1995 WL 656960, at *8 (denying motion to suppress DNA evidence obtained pursuant to the execution of a valid search warrant in the absence of a showing that the warrant was obtained on an improper basis or in the absence of probable cause).[5]

To the extent Plaintiff argues that simply directing the hospital to preserve the samples until law enforcement officials could obtain a search warrant violates the Fourth Amendment, Plaintiff's position has no support in law.  Although the Fourth Amendment may have been implicated if Plaintiff's blood and urine samples were originally drawn for law enforcement purposes or at the request of law enforcement officers, *see Ferguson v. City of Charleston*, 532

---

[5] Plaintiff does argue that the search warrant was issued "out of [the judge's] jurisdiction" and that it was therefore invalid.  (Pl.'s Mem. 15–16.)  Plaintiff notes that Nagler is an ADA in Westchester County, and asserts that "Plaintiff's two active warrants weren't adopted by the local criminal court in the Bronx, N.Y."  (*Id.* at 16.)  It is not clear how this argument relates to the search warrant obtained for Plaintiff's blood and urine samples, as Plaintiff did not include the search warrant or indicate what court issued it, and Plaintiff's reference to "two active warrants" appears to relate to his outstanding *arrest* warrants, rather than the *search* warrant. (*See* SAC 13.)  *See Moore v. City of New York*, No. 08-CV-2449, 2011 WL 795103, at *4 (E.D.N.Y. Feb. 28, 2011) (characterizing allegations that a judge acted "in complete absence of all jurisdiction" as "self-serving, conclusory statements" that "do not raise plausible claims that [a judge] acted in the complete absence of jurisdiction or outside his judicial capacity").

U.S. 67, 83 (2001) (holding that blood samples could not be turned over to law enforcement without consent or a warrant where "the immediate objective of the searches was to generate evidence for law enforcement purposes"), Plaintiff specifically alleges that his samples were taken "upon admission to [JMC] for testing for hospital purposes," (SAC 18; *see also* Pl.'s Mem. 27 (toxicology screening test noting that "results should not be used for non-medical purposes"). Where blood or urine samples are taken for medical purposes, rather than to facilitate prosecution of the patient, the Fourth Amendment is not implicated. *See Makas v. Miraglia*, No. 05-CV-7180, 2007 WL 152092, at *6 (S.D.N.Y. Jan. 23, 2007) ("[C]ourts have found the special needs exception [to the Fourth Amendment's warrant requirement] applicable in a hospital setting when there is no evidence that the medical tests are intended to serve a law enforcement purpose." (relying on, inter alia, *Anthony*, 339 F.3d at 142); *cf. Kia P. v. McIntyre*, 2 F. Supp. 2d 281, 292 (E.D.N.Y. 1998) ("[A]lthough the Fourth Amendment is triggered when state authorities have children undergo medical procedures for investigative purposes, the record here indicates that the urine test was not ordered by [the government] and was given for medical and not investigative purposes." (citation omitted)), *aff'd*, 235 F.3d 749 (2d Cir. 2000). Because Plaintiff's own submissions indicate that his samples were collected for medical purposes, (*see* SAC 17 ("Plaintiff's blood and urine [were] taken by Jacobi Medical staff for hospital purposes . . . .")), Nagler obtained those samples pursuant to a search warrant, (*see id.* ("Nagler sent Jacobi Medical a letter to hold [Plaintiff's] blood and urine until they obtain a search warrant.")), and Plaintiff failed to allege any facts undermining the validity of the warrant, Plaintiff fails to state a Fourth Amendment claim, *see Anthony*, 339 F.3d at 142 (holding blood and urine tests "undertaken to facilitate [the plaintiff's] diagnosis and treatment" were "constitutionally permissible" because they "were not conducted for any law enforcement purpose"); *Makas*, 2007

WL 152092, at *7 (holding there "was no need for the [d]efendants to secure a warrant or court order before drawing [the plaintiff's] blood" because "[s]uch testing plainly was undertaken to ensure that [the plaintiff] remained healthy . . . and did not infect others, rather than to further a law enforcement purpose").

### b.  False Arrest

It is not clear whether Plaintiff seeks to bring his false arrest claim against Nagler.  The only claim Plaintiff specifically identifies as pertaining to Nagler is the allegedly unlawful search based on her directive to JMC to turn over Plaintiff's DNA samples.  (SAC 6.)

To the extent Plaintiff does intend to assert a false arrest claim against Nagler, he fails to allege Nagler's personal involvement.  "It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show . . . the defendant's personal involvement in the alleged constitutional deprivation."  *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013).  To establish personal involvement, a plaintiff must show that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Id.* at 139 (citation, italics, and quotation marks omitted).  In other words, "[b]ecause vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  *Iqbal*, 556 U.S. at 676.  Therefore, Plaintiff must plausibly allege that Nagler's actions fall into one of the five categories identified above.  *See Lebron v. Mrzyglod*, No. 14-CV-10290, 2017 WL

365493, at *4 (S.D.N.Y. Jan. 24, 2017) (holding that the five categories "still control[] with respect to claims that do not require a showing of discriminatory intent" post-*Iqbal*).

Plaintiff includes no allegations tying Nagler to his arrest. Although "[u]nder both federal and New York law, a plaintiff need not have been formally arrested to claim false arrest," *Calderon v. City of New York*, 138 F. Supp. 3d 593, 610 (S.D.N.Y. 2015) (citations omitted), and Plaintiff's confinement while at JMC can therefore potentially support a false arrest claim, he does not allege that Nagler was involved in his arrest in any capacity, only that she sought DNA evidence in connection with his prosecution, *see Falls v. Pitt*, No. 16-CV-8863, 2018 WL 3768036, at *6 (S.D.N.Y. Aug. 8, 2018) (holding that personal involvement was not established where the plaintiff failed to allege the defendants were "present" for the alleged violation or "participated directly" in or "somehow permitted" the alleged violation).

Furthermore, Plaintiff cannot sustain a claim of false arrest against any Defendant because he was convicted of the crime for which he was arrested. "A [§] 1983 claim for false arrest is substantially the same as a claim for false arrest under New York law." *Simpson v. City of New York*, 793 F.3d 259, 265 (2d Cir. 2015) (citations and quotation marks omitted). "To prevail, a plaintiff must prove four elements: (1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not contest the confinement[,] and (4) the confinement was not otherwise privileged." *Crews v. County of Nassau*, 996 F. Supp. 2d 186, 203 (E.D.N.Y. 2014) (citation and quotation marks omitted). A confinement is "otherwise privileged" if there was probable cause to arrest; probable cause is thus a "complete defense" to an action for false arrest. *Simpson*, 793 F.3d at 265. "[A] conviction for the offense which precipitated the arrest is definitive evidence of probable cause." *Jean-Laurent v. Cornelius*, No. 15-CV-2217, 2017 WL 933100, at *4 (S.D.N.Y. Mar. 8, 2017)

(citations omitted); *see also Phelan v. Sullivan*, 541 F. App'x 21, 23 (2d Cir. 2013) ("A false arrest claim is defeated by the plaintiff's conviction for the offense for which he was arrested." (citation omitted)); *Cameron v. Fogarty*, 806 F.2d 380, 387 (2d Cir. 1986) ("[A] conviction of the plaintiff following the arrest is viewed as establishing the existence of probable cause." (citation omitted)); *Clark v. City of New York*, No. 16-CV-7744, 2018 WL 4372671, at *4 (S.D.N.Y. Sept. 13, 2018) ("A conviction of the crime for which an individual is arrested bars recovery for false arrest or malicious prosecution." (citing *Cameron*, 806 F.2d at 387)); *Hudson v. County of Dutchess*, No. 12-CV-5548, 2015 WL 7288657, at *11 (S.D.N.Y. Nov. 16, 2015) (collecting cases). This is true even if Plaintiff was convicted of a lesser offense than the one with which he was initially charged. *See O'Donnell v. Card*, No. 11-CV-3297, 2013 WL 3929632, at *4 (S.D.N.Y. July 30, 2013) ("[R]egardless of whether probable cause supported any individual charge identified by the defendant, a plaintiff cannot recover [for a false arrest claim] where the arrest resulted in a valid conviction." (citing *Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006))). Because Plaintiff was convicted at trial, (*see* Pl.'s Mem. 5 (noting that Plaintiff "is not challenging his conviction"), *id.* (alleging that he was "found . . . guilty" even though "he didn't crash any car")), Plaintiff's false arrest claim fails. Accordingly, this claim is dismissed.

### 2. Claims Against Warden Diaz

Plaintiff's only allegations against Diaz are that he had a "duty to ensure that [P]laintiff['s] health was tak[en] care [of] in a timely ma[nn]er," and that he failed to do so because Plaintiff did not receive treatment for his infection for seven and a half months. (SAC 20; *see also id.* at 16 (alleging that Diaz had a "duty to ensure [P]laintiff's health and safety")).

As already discussed, "[i]t is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show . . . the defendant's personal involvement in the alleged constitutional deprivation." *Grullon*, 720 F.3d at 138. Moreover, "[a] supervisor cannot be held liable under [§] 1983 under the doctrine of respondeat superior; personal involvement of the supervisor is required." *DeMeo v. Koenigsmann*, No. 11-CV-7099, 2015 WL 1283660, at *15 (S.D.N.Y. Mar. 20, 2015) (citing *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 n.58 (1978); *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994); and *Leonhard v. United States*, 633 F.2d 599, 621 n.30 (2d Cir. 1980)). "The personal involvement and liability of supervisory personnel is established when the supervisory official has 'actual or constructive notice of unconstitutional practices and demonstrates gross negligence or deliberate indifference by failing to act.'" *Rahman v. Fisher*, 607 F. Supp. 2d 580, 585 (S.D.N.Y. 2009) (quoting *Meriwether v. Coughlin*, 879 F.2d 1037, 1048 (2d Cir. 1989)).

Plaintiff's failure to include any allegations that Diaz was grossly negligent or deliberately indifferent in addressing unconstitutional conduct of which he had actual or constructive notice is fatal to his claims against Diaz. *See Whitley v. Ort*, No. 17-CV-3652, 2018 WL 4684144, at *7 (S.D.N.Y. Sept. 28, 2018) ("Even if [the defendant doctor] was responsible for supervising medical care at [the prison at which the plaintiff was incarcerated], supervisory status, without more, is not sufficient to subject a defendant to § 1983 liability." (citation, quotation marks, and original alterations omitted)); *Falls*, 2018 WL 3768036, at *6 (holding that personal involvement was not established where the plaintiff failed to allege that the defendants were "present" for, "participated directly" in, or "somehow permitted" the alleged violation); *Constant v. Annucci*, No. 16-CV-3985, 2018 WL 1684411, at *4 (S.D.N.Y. Apr. 5, 2018) (holding personal involvement not satisfied where the "allegation merely states, in conclusory

terms, that [the supervisory defendants] subjected [the plaintiff] to the conditions complained of"); *Banks v. Annucci*, 48 F. Supp. 3d 394, 416 (N.D.N.Y. 2014) ("Where a defendant is a supervisory official, a mere 'linkage' to the unlawful conduct through the 'chain of command' (i.e., under the doctrine of respondeat superior) is insufficient to show his or her personal involvement in that unlawful conduct." (citations omitted)).  Indeed, Plaintiff specifically states that he "could not prove that Warden Diaz knew that [P]lantiff['s] face was infected."  (Pl.'s Letter 2 (noting that Plaintiff "has no evidence showing that Warden Diaz knew Plaintiff['s] face was infected").)  Accordingly, Plaintiff's claims against Diaz are dismissed.

### 3.  Claims Against Teperman

#### a.  Deliberate Indifference

Plaintiff asserts a claim against Teperman for deliberate indifference to medical needs. (SAC 7.)  Teperman argues that this claim is time-barred.  (Teperman Mem. 8–13.)

"In [§] 1983 actions, the applicable limitations period is found in the 'general or residual state statute of limitations for personal injury actions.'"  *Ormiston v. Nelson*, 117 F.3d 69, 71 (2d Cir. 1997) (citation and original alterations omitted).  "An Eighth Amendment deliberate indifference claim is considered to be a personal injury action," *Gonzalez v. Wright*, 665 F. Supp. 2d 334, 348 (S.D.N.Y. 2009) (citing *Shomo v. City of New York*, 579 F.3d 176, 180–81 (2d Cir. 2009)), and therefore New York's three-year statute of limitations for personal injury actions applies, *see Pearl v. City of Long Beach*, 296 F.3d 76, 79 (2d Cir. 2002) (holding that, because § 1983 does not contain a specific statute of limitations, courts apply the statute of limitations for personal injury actions under state law, which in New York is three years (citing N.Y. C.P.L.R. § 214(5))).

While the length of the limitations period is determined by reference to state law, "the time at which a claim . . . accrues is 'a question of federal law.'" *Spak v. Phillips*, 857 F.3d 458, 462 (2d Cir. 2017) (quoting *Wallace v. Kato*, 549 U.S. 384, 388 (2007)). Under federal law, a claim begins accruing when the plaintiff has "a complete and present cause of action, that is, when the plaintiff can file suit and obtain relief." *Wallace*, 549 U.S. at 388 (citations and quotation marks omitted); *see also Smith v. Campbell*, 782 F.3d 93, 100 (2d Cir. 2015) (same). Put differently, a claim begins accruing when "the plaintiff knows or has reason to know of the injury which is the basis of his action." *Veal v. Geraci*, 23 F.3d 722, 724 (2d Cir. 1994) (citation and quotation marks omitted).

Where a plaintiff filed his original complaint within the statute of limitations but named new or different defendants in an amended complaint after the limitations period had run, the claims are time-barred unless they "relate back" under Federal Rule of Civil Procedure 15(c).

> [U]nder Rule 15(c)(1)(C), an amended complaint relates back to the original complaint if: (1) it "changes the party or the naming of the party against whom a claim is asserted"; (2) the claim or defense asserted by the amendment arises out of the same transaction as the original complaint; (3) the party added by the amendment "received such notice of the action that it will not be prejudiced in defending on the merits"; and (4) the added party "knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity." Furthermore, the third and fourth elements must be satisfied within the 120-day period of Rule 4(m) for serving a summons and complaint.

*Vasconcellos v. City of New York*, No. 12-CV-8445, 2014 WL 4961441, at *5 (S.D.N.Y. Oct. 2, 2014) (quoting Fed. R. Civ. P. 15(c)(1)(C)).

"A claim of deliberate indifference of medical needs brought under [§] 1983 accrues when medical treatment is denied." *Miles v. City of New York*, No. 14-CV-9302, 2018 WL 3708657, at *10 (S.D.N.Y. Aug. 3, 2018) (holding the plaintiff's deliberate indifference claim accrued on "the date [the defendant] allegedly denied [the] [p]laintiff treatment for his injuries"

(citation, alteration, and quotation marks omitted)); *see also Cotto v. City of New York*, No. 15-CV-9123, 2017 WL 3476045, at *3 (S.D.N.Y. Aug. 11, 2017) (holding the plaintiffs' claims accrued on the date that the plaintiffs "allege their various federal constitutional violations . . . occurred"), *appeal dismissed*, No. 17-2862, 2017 WL 6397761 (2d Cir. Dec. 11, 2017); *Traore v. Police Office[r] Andrew Ali Shield*, No. 14-CV-8463, 2016 WL 316856, at *5 (S.D.N.Y. Jan. 26, 2016) (holding the plaintiff's claims accrued on the two dates he was denied medical treatment because he "was immediately aware of his injuries when they occurred . . . and was aware that he did not receive treatment when he first requested it").

Plaintiff claims he was denied adequate care on October 27, 2014, when he was not informed that he was at risk of infection, and states that he "became aware of his face being infected[] sometime in Nov[ember] 2014 when he [saw] Dr. Frank L. Weber[,] who informed [P]laintiff that his face was infected and [he] needed a second surgery." (Pl.'s Mem. 33.) Plaintiff's claim therefore accrued, at the very latest, in November 2014 when he learned of the infection that he alleges Teperman failed to warn him about before his discharge from JMC. Plaintiff therefore needed to bring his claim against Teperman by November 2017 in order for it to be timely. Although Plaintiff initiated this Action on October 30, 2017, Teperman was named as a Defendant for the first time on April 24, 2018, in the First Amended Complaint. (*See* FAC.) Therefore, Plaintiff's deliberate indifference claim is time-barred unless the First Amended Complaint relates back to the original Complaint under Rule 15(c)(1)(C). *See Vasconcellos*, 2014 WL 4961441, at *5.

Teperman is not named in the original Complaint at all; nor is there any mention of Plaintiff's treatment at JMC or any specific allegations against any medical professionals. (*See* Order To Amend 7 (noting that Plaintiff "d[id] not name any individuals who he alleges denied

him medical care" in his Complaint).)  Under such circumstances, Rule 15(c)(1)(C) is

inapplicable, because "the rule applies only where an amendment 'changes the party or the

naming of the party against whom a claim is asserted'—not where an amendment adds a

previously unmentioned party." *Neal v. Wilson*, 239 F. Supp. 3d 755, 759 (S.D.N.Y. 2017)

(collecting cases); *see also Salazar v. City of New York*, No. 15-CV-1989, 2016 WL 879318, *4

(S.D.N.Y. Mar. 7, 2016) ("Rule 15(c)(1)(C) governs replacement of defendants, not additions; it

does not allow 'relation back for amended complaints that add new defendants, where the newly

added defendants were not named originally because plaintiff did not know their identities.'"

(quoting *Hogan v. Fischer*, 738 F.3d 509, 517 (2d Cir. 2013))); *Pikos v. Liberty Maint., Inc.*, No.

09-CV-4031, 2015 WL 6830670, at *3 (E.D.N.Y. Nov. 6, 2015) ("Courts in this Circuit have

held relation back is only permitted where [the] plaintiff named the wrong party in the original

complaint, and not where [the] plaintiff named one but not all of the right defendants."

(collecting cases)); *Velasquez v. Dig. Page, Inc.*, No. 11-CV-3892, 2014 WL 2048425, *3

(E.D.N.Y. May 19, 2014) ("Where a plaintiff has not mistakenly sued the wrong party, a court

need not consider what a defendant knows and when the defendant knew it; the threshold

requirement for Rule 15(c)(1)(C)—a 'mistake concerning the proper party's identity'—has not

been met." (citations omitted)); *In re Vitamin C Antitrust Litig.*, 995 F. Supp. 2d 125, 129

(E.D.N.Y. 2014) ("In an 'additional party' case . . . [t]he plaintiff has sued the right defendant,

and simply neglected to sue another defendant who might also be liable.  If the drafters of Rule

15 had meant to allow relation back in this situation, they could have easily done so.").

  "An amendment adding a defendant to a complaint relates back to the original pleading if

the new defendant has: '(i) received such notice of the action that it will not be prejudiced in

defending on the merits; and (ii) knew or should have known that the action would have been

brought against it, but for a mistake concerning the proper party's identity.'" *Nash v. Kressman*, No. 11-CV-7327, 2013 WL 6197087, at *6 (S.D.N.Y. Nov. 27, 2013) (quoting Fed. R. Civ. P. 15(c)(1)(C)). Plaintiff's subsequent amended complaints cannot relate back where he "simply neglected to sue another defendant who might also be liable." *Vitamin C*, 995 F. Supp. 2d at 129; *see also Vasconcellos*, 2014 WL 4961441, at *7 (finding § 1983 claims time-barred where the plaintiff "knew who the proper defendants were" as they "were involved in the incident" underlying the complaint, but "did not . . . know their names," because the plaintiff "was ignorant, not mistaken"); *Nash*, 2013 WL 6197087, at *6 (holding § 1983 deliberate indifference claims based on events alleged in the original complaint were "only timely . . . as to" the defendant named in the original complaint, and not those added in amended complaints after the limitations period had run). Here, there is simply nothing in the original Complaint that could have put Teperman on notice of Plaintiff's claims. *Cf. Ceara v. Deacon*, 916 F.3d 208, 213–14 (2d Cir. 2019) (holding that the plaintiff made a mistake as to the proper party's identity under Rule 15(c)(1)(C), where, inter alia, he misspelled the defendant's name in the case caption and included specific identifying information, making it "implausible that DOCCS and [the defendant] did not know to whom [the plaintiff] was referring").

Additionally, no Party named in the original Complaint is "united in interest" with Teperman such that he could have been on notice of Plaintiff's claims, as Plaintiff only named Westchester County Jail and Westchester County District Attorney's Office employees in the original Complaint. (Compl. 3.) Under New York law, "[i]n an action which is commenced by filing, a claim asserted in the complaint is interposed against the defendant or a co-defendant united in interest with such defendant when the action is commenced." N.Y. C.P.L.R. § 203(c). No such unity of interest exists here. Teperman was Plaintiff's doctor at JMC, a municipal

hospital in the Bronx; the only Defendants named in Plaintiff's original Complaint were various Westchester County government officials. Additionally, Teperman is not represented by the same counsel as any of the originally-named Defendants. *Cf. Maccharulo v. Gould*, 643 F. Supp. 2d 587, 594 (S.D.N.Y. 2009) (finding amendment relates back to newly-named state entities because "constructive notice may be imputed to a new defendant state entity through its attorney when the attorney also represented the officials originally sued, so long as there is some showing that the attorneys knew that the additional defendants would be added to the existing suit" (citation and quotation marks omitted)); *see also Muhammad v. Pico*, No. 02-CV-1052, 2003 WL 21792158, at *20 (S.D.N.Y. Aug. 5, 2003) (collecting cases). Furthermore, the claims against Teperman and those asserted in the original Complaint "would not necessarily stand or fall together," *Lin v. Joedy*, 214 F. Supp. 3d 207, 218 (W.D.N.Y. 2016) (citation and quotation marks omitted), as the Court could find Teperman liable for his alleged conduct without finding liability on the part of any of the originally-named Defendants, whose alleged conduct was entirely separate from Teperman's treatment of Plaintiff. *See Girau v. Europower, Inc.*, 317 F.R.D. 414, 424 (S.D.N.Y. 2016) ("The 'united in interest' requirement, that the parties be closely linked so they stand or fall together, and judgment against one will similarly affect the other, is New York's corollary to constructive notice under Rule 15(c) . . . ." (citation and quotation marks omitted)). The Court cannot find any case in which defendants who were alleged to have engaged in separate conduct, represented by separate counsel, and raised different defenses were found to be "united in interest" under § 203(c). Indeed, the caselaw winds are blowing against Plaintiff here. *See Ramos v. Police Officer Maureen Engels*, No. 15-CV-1081, 2016 WL 3619534, at *7 (E.D.N.Y. June 3, 2016) ("[The] [p]laintiff's argument that the officers are united in interest simply because they 'obviously share the same defenses' is

insufficient to meet the requirements of [§] 203. There must be a legal relationship *between* the defendants."), *adopted by* 2016 WL 3640684 (E.D.N.Y. June 29, 2016); *Feliciano v. County of Suffolk*, No. 04-CV-5321, 2013 WL 1310399, at *8 (E.D.N.Y. Mar. 28, 2013) ("Constructive notice is derived from the presumed knowledge of the attorney who represents the original defendant(s) and who would represent the prospective defendant(s) if leave to amend were granted." (citations and quotation marks omitted)); *Velez v. Fogarty*, No. 06-CV-13186, 2008 WL 5062601, at *5 (S.D.N.Y. Nov. 20, 2008) ("The constructive notice doctrine is based on the theory that the newly added defendant is not prejudiced by the lack of notice if his attorney has already begun preparing a defense for the named defendant during the limitations period." (citation omitted)). Plaintiff's deliberate indifference claim against Teperman is thus time-barred and must be dismissed.

Even if Plaintiff's deliberate indifference claim were not time-barred, it would nonetheless be dismissed for failure to state a claim. "The Eighth Amendment forbids 'deliberate indifference to serious medical needs of prisoners.'" *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). To state a deliberate indifference claim, Plaintiff must plausibly allege (1) "that he suffered a sufficiently serious constitutional deprivation," and (2) that Defendants "acted with deliberate indifference." *Feliciano v. Anderson*, No. 15-CV-4106, 2017 WL 1189747, at *8 (S.D.N.Y. Mar. 30, 2017) (citations omitted).

Once upon a time, "[c]laims for deliberate indifference to a . . . serious threat to the health or safety of a person in custody [were] analyzed under the same standard irrespective of whether they [we]re brought under the Eighth or Fourteenth Amendment." *Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009). However, in *Darnell v. Pineiro*, 849 F.3d 17 (2d Cir. 2017), the

Second Circuit overruled *Caiozzo* "to the extent that it determined that the standard for deliberate indifference is the same under the Fourteenth Amendment as it is under the Eighth Amendment." *Darnell*, 849 F.3d at 35. Because Plaintiff appears to have been a pretrial detainee at the time of the alleged conduct, his claim arises under the Fourteenth Amendment. *See Davis v. McCready*, 283 F. Supp. 3d 108, 116 (S.D.N.Y. 2017) ("A pretrial detainee's claim for deliberate indifference is evaluated under the Due Process Clause of the Fourteenth Amendment rather than the Eighth Amendment, as '[p]retrial detainees have not been convicted of a crime and thus may not be punished in any manner—neither cruelly and unusually nor otherwise.'" (quoting *Darnell*, 849 F.3d at 29)).

"Like under the Eighth Amendment, deliberate indifference pursuant to the Fourteenth Amendment has both an objective and a subjective prong." *Figueroa v. County of Rockland*, No. 16-CV-6519, 2018 WL 3315735, at *4 (S.D.N.Y. July 5, 2018). The objective prong is the same under either analysis: It requires that the deprivation at issue be, "in objective terms, sufficiently serious." *Id.* (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)); *see also Darnell*, 849 F.3d at 30 (noting that the objective prong of a deliberate indifference claim is the same under the Eighth and Fourteenth Amendments). In other words, "the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (citations omitted). Analyzing this objective requirement involves two inquiries: "whether the prisoner was actually deprived of adequate medical care," *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006), and "whether the inadequacy in medical care is sufficiently serious," which in turn "requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner," *id.* at 280. "There is no settled, precise metric to guide

a court in its estimation of the seriousness of a prisoner's medical condition." *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003). Nevertheless, the Second Circuit has suggested the following non-exhaustive list of factors to consider when evaluating an inmate's medical condition: "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) 'the existence of chronic and substantial pain.'" *Id.* (quoting *Chance*, 143 F.3d at 702).

The subjective prong differs depending on whether an inmate is a convicted prisoner or a pretrial detainee. If a convicted prisoner, an inmate must allege that prison officials were "subjectively reckless in their denial of medical care." *Spavone*, 719 F.3d at 138. This means that the official must "appreciate the risk to which a prisoner was subjected," and have a "subjective awareness of the harmfulness associated with those conditions." *Darnell*, 849 F.3d at 35; *see also Nielsen v. Rabin*, 746 F.3d 58, 63 (2d Cir. 2014) ("Deliberate indifference is a mental state equivalent to subjective recklessness" that "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." (citation and quotation marks omitted)). In the case of pretrial detainees, "the 'subjective prong' (or 'mens rea prong') . . . is defined objectively." *Darnell*, 849 F.3d at 35 (italics omitted). After *Darnell*, pretrial detainees asserting conditions of confinement claims under the Fourteenth Amendment must allege "that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Id.*; *see also Figueroa*, 2018 WL 3315735, at *4 (same).

Plaintiff alleges that on October 27, 2014, he "signed out of the hospital in fear of his life from the Yonkers police officer[s] . . . after numerous attempts of notifying the Doctors that the Yonkers police officer[s] . . . were trying to kill him." (SAC 7.) He asserts that Teperman "had a duty to . . . inform [Plaintiff] of his severe[] medical condition," and that if Teperman "would [have] inform[ed] [Plaintiff] of the infection he was suffering [Plaintiff] would [have] never signed out [of] the hospital." (*Id.* at 8.)

Plaintiff's allegations fail to meet either prong. Plaintiff fails to plead that he was actually deprived of adequate care; rather, Plaintiff's submissions show that he received necessary surgery, checked himself out of the hospital, and was given a follow up appointment for October 31, 2014, four days after his discharge. (*See* SAC 5 (medical records noting that Plaintiff would have a "[f]ollow up in OMFS clinic Friday, 10/31/14").) Plaintiff was provided with several medications at discharge, and was "educated . . . regarding his[] medication regimen." (*Id.*) On the day of his discharge, Plaintiff reported having no pain or discomfort, and medical professionals noted that there was "[n]o sign of infection nor infiltration." (Pl.'s Letter 10; *see also* Pl.'s Mem. 60 (medical records from October 25, 2014 noting that there was "no sign of infection"), 58 (medical records from October 26, 2014 indicating that Plaintiff was "recovering uneventfully" and that his surgical site was "healing normally," and that Plaintiff reported that he "feels perfect and wants to leave").) Thus, at the time Plaintiff unilaterally decided to check himself out of the hospital, there was no medical issue to warn Plaintiff about or to treat prior to his discharge. Although the Second Circuit has recognized that inadequate discharge planning can support a deliberate indifference claim, *see Charles v. Orange County*, 925 F.3d 73, 89 (2d Cir. 2019) (holding the plaintiffs plausibly alleged deliberate indifference claims where the defendants failed to provide sufficient mental health discharge planning before

releasing the plaintiffs from custody), there is nothing in Plaintiff's submissions plausibly indicating that his discharge planning was constitutionally deficient under the circumstances present at that time.

With respect to the subjective prong, even under the Fourteenth Amendment Plaintiff still must allege that Teperman "recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though [he] knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35. There is no indication that Teperman knew of any risk to Plaintiff's health, and Plaintiff's medical records suggest that there was no ascertainable risk to his health at the time he chose to leave the hospital. (*See* Pl.'s Letter 10 (indicating "no sign of infection" on the day of Plaintiff's discharge).) Plaintiff argues that Teperman "had to know that [Plaintiff] was [at] grave risk of infection because [his] medical records show[] that . . . Teperman knew of [Plaintiff's] infection risk before he did [P]laintiff['s] first surgery on October 24, 2014." (Pl.'s Mem. 29.) Plaintiff's medical records on October 20, 2014, the day after he was admitted, do indicate a "*[p]otential [i]nfection [r]isk*." (*Id.* at 41 (emphasis added).) However, rather than recklessly failing to act with reasonable care to mitigate that risk, Plaintiff's own submissions suggest that his medical team implemented a plan to "[p]revent/minimize infection," including by using sterile techniques for all invasive procedures, monitoring vital signs, practicing IV line and tubing changes, following up on lab results, and regularly changing Plaintiff's IV line and tubing. (*See id.*) Plaintiff makes no allegations that this plan was not followed, or that any of his medical care while he remained at JMC was recklessly insufficient. Plaintiff's medical records also show that on October 27, 2014, the date he was released from the hospital, he exhibited "[n]o sign of infection or infiltration," and that he expressed "no discomfort" and had "no pain at this time,"

suggesting his medical team was specifically monitoring his progress for potential infection and identified none.  (Pl.'s Letter 10.)  Accordingly, Plaintiff's deliberate indifference claim against Teperman is dismissed.

### b.  Fourth Amendment

Plaintiff also asserts a Fourth Amendment claim against Teperman based on JMC's turning over Plaintiff's blood and urine samples to Nagler.  The Court has already held that Plaintiff's own submissions confirm that the samples were released pursuant to a search warrant; Teperman's compliance with that warrant was therefore constitutionally sound.  Furthermore, as discussed, because Plaintiff's samples were taken by hospital employees for medical purposes, rather than for the purpose of turning them over to law enforcement, the collection of the samples falls cleanly within the special needs doctrine and thus does not violate the Fourth Amendment.  *Anthony*, 339 F.3d at 142 ("Here, the blood and urine tests were not conducted for any law enforcement purpose, but rather were undertaken to facilitate [Plaintiff's] diagnosis and treatment by ruling out drug use or other physiological conditions as a possible explanation for her delusional behavior.  The tests were therefore constitutionally permissible.").  Accordingly, Plaintiff's Fourth Amendment claim against Teperman is dismissed.[6]

### III. Conclusion

For the foregoing reasons, Defendants' Motion To Dismiss is granted.  However, because this is the first adjudication of Plaintiffs' claims on the merits, the dismissal is without prejudice.  *See Terry v. Inc. Vill. of Patchogue*, 826 F.3d 631, 633 (2d Cir. 2016) (explaining that "district

---

[6] Because Plaintiff's federal claims are dismissed, the Court declines to exercise supplemental jurisdiction over any state law claims that Plaintiff intended to assert for medical malpractice or negligence.  *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) (noting that "if the federal claims [in an action] are dismissed before trial . . . the state claims should be dismissed as well" (citation omitted)).

judges should, as a general matter, liberally permit pro se litigants to amend their pleadings"

unless "amendment would be futile" (citation omitted)). Should Plaintiff choose to file a third

amended complaint, he must do so within 30 days of this Opinion, addressing the deficiencies

identified herein. The third amended complaint will replace, not supplement, the Second

Amended Complaint currently before the Court. It therefore must contain *all* of the claims and

factual allegations Plaintiff wishes the Court to consider. The Court will not consider factual

allegations raised in supplemental declarations, affidavits, or letters. If Plaintiff fails to abide by

the 30-day deadline, Plaintiff's claims against County Defendants and Teperman may be

dismissed with prejudice.

The Clerk of the Court is respectfully requested to terminate the pending motions, (Dkt.

Nos. 52, 64), and to mail a copy of this Opinion to Plaintiff.

SO ORDERED.

Dated: September 17, 2019
       White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE